Erin Rose Ronstadt, SBN 028362
Kyle Shelton, SBN 027379
RONSTADT LAW, PLLC
P.O. Box 34145
Phoenix AZ 85067
Phone: (602) 615-0050
Fax: (602) 761-4443
erin@ronstadtlaw.com
kyle@ronstadtlaw.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Elijah Harms,<br><br>                  Plaintiff,<br>v.<br><br>The Guardian Life Insurance Company of America,<br><br>                  Defendant. | No.<br><br>**COMPLAINT** |

For his claims against The Guardian Life Insurance Company of America ("Defendant" or "Guardian"), an Employee Retirement Income Security Act ("ERISA") plan fiduciary, Plaintiff Elijah Harms ("Mr. Harms" or "Plaintiff") alleges as follows:

***Jurisdiction, Venue and Parties***

1. This action arises under ERISA, 29 U.S.C. §§ 1001 *et seq.*

2. Mr. Harms was a participant and beneficiary of the AJAC, Inc. Health and Welfare Benefit Plan (the "Plan") as an employee of AJAC, Inc. d/b/a George Brazil ("AJAC").

3. The Plan is a purported ERISA benefit plan established and maintained by AJAC for the benefit of its employees.

4. AJAC is the Plan Sponsor, Plan Administrator, a plan fiduciary, and employer.

5. Guardian is a third-party claims administrator for the Plan.

6. Guardian is a Plan fiduciary.

7. Under the Plan, Guardian fully insures claims for long-term disability ("LTD") benefits pursuant to Policy Number G-00420338-HC ("the Policy").

8. Guardian has a duty to administer the Plan prudently and in the best interests of all Plan participants and beneficiaries.

9. At the time Mr. Harms sought LTD benefits under the Plan, Guardian administered claims for AJAC under the Plan, acted on behalf of the Plan, and acted as an agent of AJAC and/or the Plan to make final decisions regarding the payment of disability benefits for the Plan and to administer the Plan.

10. Mr. Harms currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

11. Guardian has its principal place of business in the State of New York.

12. Guardian is licensed and authorized to do business in Maricopa County, Arizona and resides and is found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

13. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

14. Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

### Mr. Harms' Disability

15. Mr. Harms suffers from several serious medical conditions including a herniated disc with nerve root compression and degenerative spondylosis of the low back; avascular necrosis (the death of bone tissue) and femoral-acetabular impingement of the hips; carpal tunnel syndrome; and rheumatoid arthritis, among other conditions.

16. Mr. Harms underwent surgery for his low back condition in March 2018, surgery for his left hip condition in October 2020, and full hip replacements in March and April 2021, respectively.

17. The October 2020 hip surgery was an attempt to save Mr. Harms' hips that failed. He subsequently underwent total left hip replacement surgery in March 2021 and total right hip replacement surgery in April 2021.

18. Before age 40, Mr. Harms underwent significant surgical intervention, which demonstrates the severity of his medical conditions.

19. A recent MRI from June 2021 showed new herniations above his previous lumbar fusion, and he is now facing additional surgery.

20. Despite surgical intervention, Mr. Harms continues to suffer from debilitating symptoms including pain and numbness in the legs and feet, pain in multiple joints, daily muscle spasms, and fatigue.

**Plan Language**

21. Under the Policy, "Disability" or "Disabled" means "a covered person has physical, mental or emotional limits caused by a current sickness or injury. And, due to these limits, he or she is not able to able to perform the major duties of his or her own occupation or any gainful work as shown below: "(1) During the elimination period and the own occupation period, he or she is not able to perform, on a full-time basis, the major duties of his or her own occupation. (2) After the end of the own occupation period, he or she is not able to perform, on a full-time basis, the major duties of any gainful work."

22. The Policy does not define "major duties."

23. The Policy definition of "Own Occupation" is "[a] covered person's occupation as done in the general labor market in the national economy. To determine the duties and requirements of his or her own occupation, we use: (a) the job description provided by the plan sponsor; and (b) the duties and requirements of that occupation as shown in the most recent version of the Dictionary of Occupational Titles. That document is published by the Department of Labor. If the Department stops publishing that document, we have the right to use some other similar standard."

24. The "Own Occupation" period under the Policy is 24 months.

-3-

25.     The Policy definition of "Gainful Occupation or Gainful Work" is "Work for which a covered person is, or may become, qualified by: (a) training; (b) education; or (c) experience. When a covered person is able to perform such work on a full-time basis, he or she can be expected to earn at least 60% of his or her indexed insured earnings, within 12 months of returning to work."

26.     The Policy pays LTD benefits until Social Security Normal Retirement Age ("SSNRA").

27.     Mr. Harms' SSNRA is 67 years old.

### Mr. Harms' LTD Benefits

28.     AJAC hired Mr. Harms as a plumber in July 2017.

29.     In September 2017, Mr. Harms began experiencing gradually worsening pain in his lower back and right lower extremity.

30.     In an October 19, 2017 visit with interventional spine specialist Dr. Christopher Huston at the Orthopedic Clinic Association ("TOCA"), Mr. Harms reported predominately right-sided lower back pain radiating to the thigh and knee, chronic neck pain, and thoracic back pain.

31.     An October 2017 MRI of Mr. Harms' lumbar spine revealed a disc protrusion with "severe encroachment of the exiting nerve root zone" at the L5-S1 level.

32.     Mr. Harms last worked on October 18, 2017.

33.     Mr. Harms stopped working due to his Disability.

34.     Mr. Harms then applied for short-term disability ("STD") benefits through Guardian on October 25, 2017 due to his inability to sit or stand for any significant length of time, repetitively bend, or lift more than light weight.

35.     During Mr. Harms' STD claim, Dr. Huston submitted two statements to Guardian indicating Mr. Harms could not perform his Own Occupation.

36.     Guardian eventually awarded Mr. Harms' STD claim and approved benefits through January 24, 2018, the maximum benefit period for STD.

37. In early 2018, Mr. Harms' providers at TOCA administered diagnostic nerve root injections and medial branch blocks, but these did not provide adequate relief.

38. Dr. Huston eventually referred Mr. Harms for a surgical consultation.

39. On March 9, 2018, Mr. Harms underwent lumbar spinal surgery, including multi-level arthrodeses, transforaminal decompressions, and pedicle screw instrumentations.

40. After some initial improvement, Mr. Harms continued to experience residual pain in his low back, hips, and right lower extremity, preventing him from lifting any significant weight, bending, twisting, turning, or performing other physical maneuvers required to perform his Own Occupation as a plumber.

41. Over time, Mr. Harms' widespread pain would not abate, and he would develop symptoms consistent with carpal tunnel syndrome, tenosynovitis, and rheumatoid arthritis.

42. In a letter dated May 11, 2018, Guardian awarded Mr. Harms' LTD claim.

43. Mr. Harms' treating physicians continued to support his claim for benefits into the LTD period.

44. While Mr. Harms struggled physically with worsening conditions, Guardian focused on vocational rehabilitation with Mr. Harms. Mr. Harms took their evaluations and fully cooperated, but with a GED and serious, developing medical conditions, any future occupation rehabilitation was unrealistic. Guardian suggested that Mr. Harms, a plumber, go into real estate, so that he could make his own schedule. Ultimately, Guardian encouraged Mr. Harms to start a small business and followed-up diligently, but Mr. Harms was too sick to pursue Guardian's "small business" plan.

45. Guardian spent more efforts pursuing vocational rehabilitation than it did in evaluating the merits of the claim.

46. In September 2018, Guardian used what appears to be disability guidelines to find that Plaintiff would be unable to perform his own occupation for "112 days," demonstrating its arbitrary claims review and attempt at limiting reserves on the claim.

47. The disability guidelines used by Guardian are from Reed Group, Ltd. ("Reed Group").

48. Reed Group is a wholly owned subsidiary of Guardian.

49. Reed Group states that it is the recognized leader in helping organizations reduce the cost, compliance risk and complexity of employee absence. Reed Group's products and services address FMLA, ADA, state and other leave laws, workers' compensation and short- and long-term disability programs.

50. Guardian's manipulation of the claim led to Genex, its vendor, refusing a SSDI referral due to Mr. Harms' purported ability to do light work.

51. Throughout the ensuing months, Mr. Harms' medical records reflect he continued to experience Disabling symptoms including persistent right leg pain and increased back and leg pain with activity.

52. Mr. Harms was treated with muscle relaxers and opioid pain medications, physical therapy, bracing, and massage therapy.

53. In early 2019, Mr. Harms began experiencing increasing pain in the right lower extremity and right buttocks.

54. On April 11, 2019, Dr. Pitt documented persistent back pain and spasming.

55. Dr. Pitt indicated Mr. Harms was "anxious to return back to work, but has been unable to do so because he is unable to pass the physical fitness test and get back into some plumbing."

56. Dr. Pitt noted Mr. Harms "currently has restrictions regarding his work of squatting, crawling, and kneeling, specifically related to working under sinks and installing faucets, **and this is not likely possible with his current spine surgery**." (emphasis added.)

57. A few days later, on April 16, 2019, Dr. Pitts completed a Physical Capabilities Evaluation indicating that while he believed Mr. Harms had some functionality, he could not bend, stoop, squat, crouch, kneel, or crawl.

-6-

58. In December 2019, Mr. Harms explained to Guardian that he could not start his own business, despite Guardian's dogged vocational rehabilitation efforts, and would be pursuing SSDI without Guardian's help.

59. Guardian eventually expected Mr. Harms to apply for Social Security, despite the fact it would not initially support the claim.

60. Mr. Harms would later secure outside Social Security legal counsel and receive a fully favorable SSDI determination because he was, in fact, unable to perform even sedentary work.

61. In December 2019, Dr. Pitt documented that Mr. Harms experienced a significant worsening of his pain after helping his father do some painting.

62. In December 2019, Mr. Harms noted ongoing neck and shoulder discomfort, fevers, chills, and night sweats. He reported constant pain and numbness in his legs.

63. During his examination, Dr. Pitt noted "**profound** limitations in range of motion of the lumbar spine, secondary to severe pain." (emphasis added.)

64. During a second visit that same month, Mr. Harms reported additional complaints including bilateral shoulder problems, carpal tunnel syndrome, bilateral hip pain, right leg numbness, and discomfort in both feet and in multiple joints in the upper and lower extremities.

65. Dr. Pitt's examination was consistent with tenosynovitis and carpal tunnel syndrome.

66. On December 10, 2019, Mr. Harms reported to Guardian that he had spent the last month bedridden and unable to see any doctors.

67. Guardian was aware that Mr. Harms did not have health insurance and had to "self pay" for appointments with treating providers. Nevertheless, Guardian expected that Mr. Harms find a way to attend doctors' appointments, because in order to extend LTD benefits beyond the change in definition of disability occurring January 18, 2020, he would need to provided updated medical records.

68. Mr. Harms' medical issues were compounding and his symptoms worsening.

69. In a visit dated January 16, 2020, Dr. Pitt indicated he was considering Mr. Harms for a possible rheumatological disorder.

70. Mr. Harms explained to Guardian around January 17, 2020 that he thought he may be having an "allergic reaction" to the metal placed in his body during surgery.

71. Dr. Pitt completed yet another statement for Guardian around this time.

72. Dr. Pitt provided restrictions and limitations that were contrary to the medical evidence. Mr. Harms explained to Guardian:

> Some of the info filled out does not match my condition. I'm not sure why it states I can sit, stand, walk, and drive 8 hours. I currently can't[sic] make it 30 minutes to an hour before I have to change position due to pain.
>
> I will be calling to discuss the incorrect information in the physical capabilities evaluation form and to discuss my options. I have stated several times in my doctor appointments that I cannot stand, sit, walk or drive for more than 30 minutes to an hour without extreme pain by the end. I have noticed in my checkup appointment paperwork none of this has been documented.

73. Guardian knew that, based on Mr. Harms' medical conditions and issues, Dr. Pitt's restrictions and limitations were inconsistent even with Dr. Pitt's own medical findings.

74. Although Mr. Harms and his treating providers were working together to investigate and treat his ongoing symptoms that were causing his Disability, Guardian initiated a nurse consultant review to analyze Mr. Harms' ability to perform any Gainful Occupation or Gainful Work.

75. On January 21, 2020, medical consultant Mark Nichols, R.N. performed a medical file review at Guardian's behest.

76. Nurse Nichols asserted, despite the overwhelming medical evidence, "there is no support for restrictions and limitations related to a physical component as there are several noted inconsistencies."

77. Nurse Nichols opined, "[Mr. Harms'] symptoms were in excess of both the physical exam findings as well as the diagnostic findings."

78. On March 8, 2020, Guardian terminated Mr. Harms' LTD benefits claim (the "Denial").

79. In the Denial, Guardian purported to rely exclusively on Nurse Nichols' opinion that Mr. Harms had no restrictions and limitations whatsoever.

80. Nurse Nichols' opinion, however, is clearly belied by the medical evidence.

81. Guardian's acceptance of "no restrictions and limitations" was arbitrary, capricious, and unreasonable.

82. Guardian denied the claim knowing that it had conflicting information on Mr. Harms' restrictions and limitations.

83. Meanwhile, Mr. Harms was continuing to explore different treatment options to relieve his symptoms that continued to preclude him from returning to any work, let alone his own occupation.

84. In July 2020, Mr. Harms' surgeon, Dr. Pitt, recommended he consider another lumbar surgery.

85. On July 10, 2020, Mr. Harms underwent an independent functional capacity examination ("FCE").

86. The independent examiner who conducted the FCE concluded Mr. Harms could not perform his Own Occupation or any other Gainful Work, including all sedentary work.

87. The examiner's conclusions were based on a comprehensive battery of physical tests used to determine Mr. Harms' physical functioning.

88. The FCE was the first time that a medical professional evaluated Mr. Harms' restrictions and limitations.

89. Mr. Harms also underwent an independent vocational assessment on August 29, 2020.

90. The independent vocational consultant indicated Guardian's termination of Mr. Harms' claim was "unreasonable and appears arbitrary and capricious and wholly lacking in good faith."

91. The vocational analyst concluded, based upon her review of the record and the FCE, that Mr. Harms was competitively unemployable.

92. On September 2, 2020, Mr. Harms appealed through legal counsel (the "Appeal").

93. With the Appeal, Mr. Harms submitted compelling new evidence of his ongoing Disability, including the aforementioned FCE report, the independent vocational assessment, and compelling, updated medical records.

94. Later in the Appeal process, Mr. Harms submitted the operative report of his left hip surgery.

95. During the Appeal process, despite the work-preclusive findings of the FCE evaluator and his recent surgery, Guardian referred Mr. Harms to an independent medical examination ("IME") with known defense examiner, Gary J. Dilla, M.D., who dismissed the independent FCE findings and, in fact, FCEs in general.

96. Guardian's IME on Appeal was in violation of ERISA and an admission that it failed to adequately investigate the claim before terminating benefits.

97. Mr. Harms was recovering from hip surgery and was in such poor condition that Dr. Dilla refused any physical examination of Mr. Harms due to the recent left hip surgery and low-grade elevated temperature. Because Dr. Dilla could not conduct an IME, he did not determine restrictions and limitations.

98. Plaintiff's surgeon, Dr. Pitt, had previously assigned restrictions and limitations that predated the hip surgery and the discovery of avascular necrosis.

99. Avascular necrosis is a serious condition characterized by the death and eventual collapse of bone tissue.

100. Dr. Dilla dismissed the FCE findings and opted to rely upon Dr. Pitt's outdated opinion from a year earlier, despite the knowledge Mr. Harms had recent left-hip surgery and continued to suffer from significant pain complaints which limited his daily functioning.

-10-

101. In his IME report, Dr. Dilla acknowledged "an MRI of September 2020 does show evidence of avascular necrosis of the bilateral hips."

102. Despite this objective evidence, he relied on Dr. Pitt's outdated conclusion Mr. Harms could sit, stand, walk, and lift weights of up to 75 pounds continuously as part of a full-time work schedule.

103. Importantly, at the time of the IME, Dr. Pitt's most recent assessment was approximately a year old.

104. Additionally, Dr. Pitt's treatment records reflect no knowledge of the bilateral avascular necrosis in Mr. Harms' hips, or other important medical developments such as his diagnosis of psoriatic arthritis.

105. Nevertheless, based on Dr. Dilla's endorsement of the limitations Dr. Pitt assigned, Guardian forwarded Mr. Harms' LTD claim for a transferable skills analysis and labor market survey review.

106. The conclusion of Guardian's vocation reviewer was that Mr. Harms could only perform his Own Occupation as a plumber because no other job the reviewer identified would be considered "gainful."

107. On December 18, 2020, Guardian upheld its termination of Mr. Harms' LTD benefits (the "Final Denial") based on the conclusion he could perform his Own Occupation.

108. Guardian's Final Denial stated Mr. Harms' administrative remedies were now exhausted.

109. Mr. Harms still cannot perform the material duties of his Own Occupation or any Gainful Occupation or Gainful Work and therefore comes within the definition of Disability under the Plan.

110. Mr. Harms' treatment after the Final Denial supports his ongoing Disability.

111. In March 2021, for instance, Mr. Harms underwent surgery on his right hip.

112. Mr. Harms continues to receive pain management treatment, where he is prescribed medications and receives a number of other invasive treatment modalities, such as epidural steroid injections.

113. On March 25, 2021, the Social Security Administration awarded Mr. Harms' SSDI benefits claim.

114. Mr. Harms timely files this suit.

**COUNT I**
**(Recovery of LTD Plan Benefits)**

115. All other paragraphs are incorporated by reference.

116. The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

117. The Plan represents LTD coverage and a promise to provide LTD benefits until Mr. Harms is no longer Disabled under the terms of the Plan.

118. Mr. Harms continues to be Disabled from his Own Occupation or any Gainful Occupation or Gainful Work.

119. Mr. Harms has claimed the benefits under the Plan to which he is entitled.

120. Mr. Harms reasonably expected that his medical conditions met the requirements of Disability as defined by the Plan and that he would receive benefits under the Plan until he reaches his Social Security Normal Retirement Age or until he was no longer Disabled.

121. Despite the coverage of Mr. Harms' Disability, Guardian improperly terminated his LTD benefits in breach of the Plan and ERISA.

122. Guardian's conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

123. Even if AJAC properly delegated discretionary authority to Guardian, in light of Guardian's wholesale and flagrant procedural violations of ERISA, Mr. Harms should be entitled to *de novo* review. *See Halo v. Yale Health Plan,* 819 F.3d 42, 60-61 (2d Cir. 2016) ("when denying a claim for benefits, a plan's failure to comply with the Department of

Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless.")

124. Guardian, failed to provide Mr. Harms' prior counsel an adequate opportunity to respond to adverse evidence during the review process, although such is required by ERISA's regulations.

125. Guardian also failed to make full disclosures of all relevant documents in response to this Firm's request.

126. Instead of evaluating a participant's eligibility based on the applicable plan language and medical evidence, Mr. Harms is informed and believes that Guardian makes claims decisions based on the claims resources and financial risk it faces on certain claims.

127. Guardian did not properly consider all of the available evidence when terminating Mr. Harms' benefits.

128. Guardian failed to conduct a full and fair review.

129. Guardian misstated medical evidence for its own financial benefit, *e.g.,* it excessively relied on biased medical reviews provided by in-house medical consultants and selectively relied on those conclusions even when faced with compelling evidence of Mr. Harms' ongoing Disability.

130. Notably, Guardian unreasonably insisted on an IME when it knew Mr. Harms had recently undergone left hip surgery and was not fully ambulatory.

131. Guardian relied on findings that constitute "clearly erroneous findings of fact" to deny Mr. Harms' benefits.

132. For instance, Guardian relied on Dr. Pitt's assessment despite the fact it was aged and more recent medical developments clearly belied his opinion.

133. Guardian used Dr. Pitt's opinion to justify its conclusion Mr. Harms could return to his Own Occupation, but Dr. Pitt's opinion does not support that conclusion.

134. In fact, in his treatment notes, Dr. Pitt concluded Mr. Harms could not return to his Own Occupation as a plumber.

135. Guardian abused its discretion by basing its decision on unreliable and inaccurate information. When confronted with this knowledge, Guardian ignored the inaccuracies or created new reasons for denial.

136. Guardian tainted its medical file reviewers by giving the reviewers inaccurate information regarding Mr. Harms, while also failing to provide its reviewers with all of the relevant evidence.

137. Dr. Dilla, for instance, stated that he was missing important evidence including electro-diagnostic testing and x-rays during his review.

138. Upon information and belief, Guardian provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

139. Upon information and belief, Guardian dishonestly selects IME vendors in an effort to preserve the appearance of propriety, but these vendors (such as Exam Coordinators' Network, also known as Genex), serve the interests of Guardian and arrange for examinations with biased doctors who will issue opinions to support the denial or termination of claims.

140. In this case, Dr. Dilla refused to even consider the authoritative and well-documented FCE, even though the FCE documented the absence of Waddell's signs and nothing else that would indicate Mr. Harms did not provide full effort.

141. The FCE examiner explicitly concluded Mr. Harms was credible.

142. The FCE is compelling, objective evidence of Mr. Harms' ongoing Disability.

143. Guardian routinely emphasizes information that favors a denial or termination of benefits while deemphasizing other information that suggests a contrary conclusion.

144. Guardian unreasonably withheld relevant documents throughout the entire claim and poorly managed the file, which is evidenced, in part, by its failure to provide all relevant documents.

145. Guardian's failure to comply with ERISA's disclosure requirements and poor management of the file demonstrates its abuse of discretion and improper claims handling.

146. Guardian failed to properly consider the evidence of independent consultants submitted with Mr. Harms' Appeal.

147. In terminating Mr. Harms' LTD benefits, Guardian completely disregarded evidence that Mr. Harms' conditions had, in fact, only worsened.

148. As noted previously, Dr. Dilla acknowledged Mr. Harms recent hip surgery and avascular necrosis, but summarily endorsed the opinion that would permit Mr. Harms to return to work.

149. Dr. Dilla is a known defense witness who routinely performs worker's compensation and long-term disability IMEs for insurance companies.

150. Dr. Dilla's opinion was outrageous, unreasonable, and biased.

151. Guardian has no evidence Mr. Harms' conditions changed or improved since it determined that he met the definition of Disabled in the Policy.

152. On information and belief, Guardian used in-house reviewers in evaluating Mr. Harms' claim, because it knew that the in-house reviewers' recommendations would be unfavorable for the continuation of Mr. Harms' benefits.

153. The peer reviewer and IME arbitrarily reached their opinions based on insufficient evidence or investigation.

154. Guardian relied on arbitrary disability guidelines provided by its own subsidiary, Reed Group.

155. Guardian engaged in other procedural irregularities, which it did to serve its own financial best interests.

156. On information and belief, Guardian engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

157. Guardian intentionally gathered evidence to stack the deck in its favor and against Mr. Harms.

158. Mr. Harms alleges upon information and belief that Guardian has a parsimonious claims handling history.

159. Guardian failed to conduct a "meaningful dialogue" regarding Mr. Harms' claim.

160. Under the de novo standard of review, to be entitled to benefits Mr. Harms need only prove by a preponderance of the evidence that he is disabled.

161. Even under the abuse of discretion standard of review, Guardian abused its discretion, because its decision terminating Mr. Harms' disability benefits was arbitrary and capricious and caused or influenced by Guardian's, its reviewing physicians, and its vendors' financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

162. Mr. Harms is entitled to discovery regarding the effects of the procedural irregularities and structural conflict of interest that infiltrated the claims handling process and also regarding the effects of Guardian's reviewing physicians', its employees', and its vendors' financial conflicts of interest, biases, and motivations on the decision terminating Mr. Harms' LTD claim.

163. Guardian had to increase its reserves for group disability claims from 2019 to 2020.

164. In 2020, Guardian paid out more in benefit payments to policyholders than it had in 2019.

165. Plaintiff is informed and believes that Guardian wanted to avoid the reserves for his claim under the "any occupation" change in definition of disability; therefore, it

found reasons to deny the claim based on its financial interests instead of the merits of the claim.

166. Under the de novo standard of review, Mr. Harms is entitled to discovery regarding, among other things, the credibility of Guardian's medical reviews and Guardian's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the de novo standard of review, new evidence may be admitted regarding, among other things: "the credibility of medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)).

167. Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal law, Mr. Harms is entitled to recover all benefits due under the terms of the Plan, and to enforce his rights under the Plan.

168. Mr. Harms is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of his disability benefits. He is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

169. Pursuant to 29 U.S.C. § 1132(g), Mr. Harms is entitled to recover his attorneys' fees and costs incurred herein.

170. Mr. Harms is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid.

**WHEREFORE**, on all claims, Mr. Harms prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A. All past and future LTD benefits under the terms of the Plan;

B. Clarifying and determining Mr. Harms' rights to future benefits under the terms of the Plan;

C. For any other benefits Mr. Harms may be entitled to receive under the Plan due to his disability;

D.   An award of Mr. Harms' attorneys' fees and costs incurred herein;

E.   An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

F.   For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 20 day of July, 2021.

                         RONSTADT LAW, PLLC

                         By: *s/ Erin Rose Ronstadt*
                             Erin Rose Ronstadt
                             Kyle Shelton
                             Attorneys for Plaintiff